### HORACE DANIELS v. STATE.

No. A-9664.  Sept. 11, 1940.
(105 P. 2d 558.)

D. C. DeVilliers, of Quapaw, and Smith & Walker, of Miami, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and J. L. Pullen, Asst. Atty. Gen., for the State.

DOYLE, P. J.  Plaintiff in error, Horace Daniels, was convicted in the district court of Ottawa county of the crime of grand larceny, and in accordance with the verdict of the jury was sentenced to serve a term of two years in the state penitentiary.

Appellant, Daniels, and one Carl Collins were jointly charged in the information upon which he was convicted, which information in substance charges that the defendant

did in Ottawa county on the 30th day of December, 1937, take and steal from the owner, the Skelton Lead & Zinc Company, shafting, pulleys, T-rails, pipe, line shaft bearings, and eccentric collars, all of the value of more than $20.

It appears that upon arraignment the defendants asked for and a severance was granted.

From the judgment rendered December 2, 1938, he appeals.

The grounds of defendant's motion for a new trial and now assigned as errors are: That the court erred in not sustaining defendant's demurrer to the testimony at the time the state rested its case; that the verdict of the jury was contrary to the evidence introduced in said cause.

It is contended that the evidence is insufficient to sustain the conviction, and that the trial court erred in overruling the defendant's demurrer to the evidence, and in refusing to direct a verdict of acquittal.

The facts which are undisputed, or which the evidence tends to prove, are: The Skelton Lead & Zinc Company occupies 200 acres of land near Century, Ottawa county, and had thereon the company's main office, a concentrating mill, a tailing mill with machinery and equipment, including shafting, pulleys, T-rails and line shafting with eccentrics thereon. A line shafting is ordinarily about 20 feet long and there were three or four joints of line shafting, equipped with collars, taken from the tailing mill within two or three days before the date alleged in the information. That the fair value of this shafting was not less than $1 a foot, and the fair value of the pulleys and collars attached thereto would be from $5 to $7 apiece, second hand.

Earl Childress, an official of the Skelton company, testified that he never did authorize any one to take the machinery or any parts of the machinery away from the lease and did not delegate any one with authority to dispose of the same; that following the arrest of the defendants he saw some of this line shafting in the Monroe Iron Company junk yard in Picher.

A. O. Jackson testified that he had occasion to go to the old No. 7 tailing mill on December 30th, the date alleged. There he found this defendant, together with his co-defendant and two or three boys. A cable fastened to defendant Daniels' truck was tied to a joint of line shafting and there was iron on the truck, including two eccentrics that were broken up.

That he called the sheriff's office and a deputy sheriff came out and arrested the defendants; that with Earl Childress he went to Ben Raymond's junk yard in Picher and there saw line shafting of the same kind.

Cross-examination.

"Q. Did you ask Mr. Daniels about this stuff on the truck when you came up there? A. Yes, I asked him. Q. Did he advise you as to whose it was, or what his connection with the lease? A. He told me Mrs. Lockwood gave it to him. Q. Didn't he tell you he had been hired by some other boy and was getting a dollar a load to haul some of this junk? A. Not at that time, he didn't; later on he did."

Alfred Van Treece testified that he works for the Skelton Company, knew Horace Daniels, and saw him on the lease by the old No. 7 mill loading scrap iron on a truck; that he told him to leave it alone, go away and not to come back; that this was three or four days before the day he called the law and had the defendants arrested.

Ben Raymond testified that he is in the junk business in Picher, doing business as the Monroe Iron Company;

that he knows Horace Daniels, and remembers him bringing in some junk in a truck about a week before the day he was arrested; that at that time he bought some line shafting from him.

On cross-examination he was handed tickets dated December 29, 1937, for 2,700 pounds of mixed iron, issued to Douglas Spry; didn't know whether it was for Daniels or not; it could be. Handed another for 975 pounds cast iron, and another ticket, the same date, for 450 pounds of scrap iron, purchased from Donaldson; another the same date, 1,360 pounds of iron, from R. Flowers, another the same date, 500 pounds iron from C. Penny.

When the state rested its case, the defendant demurred to the evidence for the reason that the same is not sufficient to sustain the allegations of the information; and moved the court to direct the jury to return a verdict of not guilty. "The Court: Demurrer and motion overruled. The defendant excepts."

As a witness in his own behalf the defendant testified:

"Well, I heard of lots of them getting junk there, and a lady named Mrs. Lockwood, she claimed she owned an interest in the mine and her husband owned an interest in the mine, and I asked her for some of the junk, and she told me not to get anything, only, well, what was not any account, only for junk, and I said 'all right', so I went and got—she went out and showed me what I could have and I loaded it and went up by and showed her what I had on the truck, and she said it was all right, go ahead and take it, I taken about three jags.

"Well, I went back there to get a little more junk, and this junk on the truck was what she told me I could have, and she said it was all right, go ahead and take it, she said she would stand between me and all trouble.

Willard Spry asked me what I would take to pull this line shafting off, I asked him if that was given to him,

and he said it was, I said, I can't pull that line shafting off, it is impossible, and he said he would give me 50 cents to pull it off, and while I was standing there talking to Jim Watkins a cable was tied on the truck and also to the line shaft, I did not tie it."

Cross-examination.

"Q. When did you first start hauling iron away from there, pieces of machinery? A. Last December, I guess. Q. Now, on December 3, 1937, you hauled 2,550 pounds cast iron from there to the Monroe Iron Works? A. Well, I didn't haul it for myself, no. Q. On the same day you hauled 2,700 pounds cast iron from the No. 7 mill, didn't you? A. No, I can't recall that time back. Q. On December 29, 1937, you hauled seven pounds copper wire and 10 pounds babbit, for one Hugh Bass, didn't you, and sold it to Monroe Iron Works? A. Well, I hauled a little metal for Hugh Bass, but I don't remember what the amount was. Q. How old is Hugh Bass? A. I could not say. Q. He is under 16 years of age? A. Yes, no doubt. Q. On the 29th day of December, 1937, you hauled 2,500 pounds of T-rails from the Skelton Company, and took it to the Monroe Iron Works? A. No, I don't recall that. Q. On the 28th day of December, 1937, you hauled 750 pounds scrap iron from the No. 7 mill and sold it to the United Iron Company, did you not? A. Yes, I remember that. Q. Now did you haul any other iron, or anything else, away from there during the month of December, except what I have asked you about? A. Well, yes, I taken a load of shafting for Willard Spry. Q. Where did you get those? A. Where the mill used to be. Q. That the Skelton No. 7? A. Yes. Q. On December 1, 1937, I will ask you if you didn't haul away from there 3,100 pounds of iron and sell it to United Iron Works? A. I did. Q. I will ask you if on the 28th of December, if you didn't haul away 750 pounds scrap iron, and sell it to Monroe Iron Company? A. Well I might have, I don't remember. Q. Do you remember hauling away on the 29th of that month one load of T-rails, weight 800 pounds? A. Yes, that is the scrap rails I was telling you about. Q. What about 2,350 pounds f rails? A. Yes, that is the other small jag.

Q. You remember hauling both of these batches away? A. Yes. Q. On the 29th do you remember hauling away 650 pounds of scrap iron and selling it to United Iron Company? A. No, I don't know I can recall that. Q. Will you say you did not? A. Well I wouldn't that I did not, nor I wouldn't say that I did. Q. These Bass boys you claim you hauled for—one is about 14 and one about 13 years old? A. Something like that. Q. And this Spry boy, about 17 or 18 years old? A. Yes. Q. How many loads did you haul after Mr. Van Treece told you not to haul any more from there? A. I could not say, he told me not to haul any more."

Margaret Watson testified that Horace Daniels was her stepfather; that she was with him when he got a load of junk and went up by Mrs. Lockwood's; she came out of the house and he said, "Is there anything here any good?" and she said, "No it is not, it is all junk stuff," and it was all right for him to take it.

Thelma Collins testified that Horace Daniels is her stepfather and Carl Collins is her husband; that during the month of December she went with her stepfather to the Skelton lease three or four times, and was there on the day he and her husband were arrested; that Willard Spry tied the cable to the truck and to the line shafting; that she was there that morning with her stepfather, when he took a load away. '

Carl Collins testified that he was with Horace Daniels on the Skelton lease when he was gathering junk on two occasions, that they went by Mrs. Lockwood's place and showed her the junk to show her it was no good, and she gave permission to take it. That he was present when Willard Spry tied a cable on to a line shaft, the other end was fastened to Daniels' truck.

Cross-examination.

"Q. You are a codefendant with Daniels in this case? A. Yes. Q. You are his son-in-law? A. Yes."

Mrs. Amy Lockwood testified that she lives in a house close by No. 7 mill; about a year ago Mr. Daniels came to the house, two women were with him; they told her some boys were breaking up the stuff there, and she went down to look at it, and she told them that anything the company could not use they could have; that since the death of her husband the company gives her $7.50 a week to live on.

Cross-examination.

"Q. You never gave Mr. Daniels permission to take anything away from there at all? A. No, sir, sent him to the office, have a book-keeper at No. 5, he has charge of everything."

The foregoing is a concise statement of the material evidence in the case. There were other numerous details which we deem it unnecessary to state, and which we consider do not involve the merits of the question of the sufficiency of the evidence.

As we view the record, it would subserve no useful purpose whatsoever to write an opinion specifically considering counsel for appellant's contentions, and our reasons for overruling the same. We deem it sufficient to say that upon a careful consideration of the case, in our opinion, the evidence both on behalf of the state and that of the defendant established the guilt of the defendant beyond any reasonable doubt, and the record discloses no prejudicial error.

The judgment of the trial court is accordingly affirmed.

BAREFOOT and JONES, JJ., concur.